IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, | * |
| | * |
| Plaintiff | |
| | * |
| v. | Civil Action No. 8:21-cv-01302-PX |
| | * |
| MIDATLANTIC FARM CREDIT, ACA, *et al.*, | |
| | * |
| Defendants. | * |

***

**MEMORANDUM OPINION**

Pending before the Court in this declaratory judgment action is Defendant MidAtlantic Farm Credit, ACA's motion to dismiss. ECF No. 18. The issues are fully briefed, and no hearing is necessary. *See* D. Md. Loc. R. 105.6. For the following reasons, the motion is GRANTED.

**I.    BACKGROUND**[1]

Plaintiff Fidelity National Title Insurance Company ("Fidelity"), a corporation in the business of providing title insurance, underwrote title insurance policies for a 75-acre tract of land in Damascus, Maryland (the "Damascus Property" or "Property"). *See* ECF No. 1 ¶¶ 2–3. Defendant Linda C. Bachenheimer Trevan ("Bachenheimer Trevan") purchased the Damascus Property with a secured loan from Defendant MidAtlantic Farm Credit, ACA ("MidAtlantic"). *See id.* ¶¶ 3 & 5.[2] The legal description of the Property referenced the inclusion of three attached

---

[1] The Court accepts as true the factual averments in the Complaint and documents incorporated by reference. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (courts may "consider documents that are explicitly incorporated into the complaint by reference").

[2] To be precise, Bachenheimer Trevan's policy was issued by Lawyers Title Insurance Company. *See* ECF No. 1-2. Fidelity is Lawyers Title Insurance Company's successor-by-merger. *See* ECF No. 1 ¶ 3.

Transfer of Development Rights ("TDRs") as part of the sale. *See* ECF No. 1-1 at 6; ECF No. 1-2 at 5. Evidently, those descriptions were wrong, as the Property included only one attached TDR and two *unattached* TDRs. Fidelity concedes that the titling defect triggers coverage under the title insurance policies issued in connection with the sale. *See* ECF No. 1 ¶ 31 ("[Fidelity] has determined that the loss of the two attached TDRs constitutes a defect or encumbrance upon the Property's insured title within the coverage of the Policies."). Accordingly, Fidelity filed this declaratory judgment action so that the Court may determine the scope of loss or damages arising from the titling defect. The Court begins with a summary of the TDR program and the pertinent transfer history of the Property relevant to this matter.

    **A.**    **Montgomery County's Master Plan and Transfer of Development Rights Program**

In 1980, the Montgomery County Council enacted the Functional Master Plan for the Preservation of Agriculture and Rural Open Space (the "Master Plan"), which rezoned large swaths of the County. ECF No. 1 ¶ 10. The Master Plan carved out a special area known as the "Agricultural Reserve," of which the Damascus Property was a part. *Id.* ¶ 11. Before the Master Plan was enacted, zoning laws allowed the construction of one home per five acres in the Agricultural Reserve; the Master Plan modified the home per acre allotment to one home per 25 acres. *Id.*

The County recognized that this change would adversely impact landowners' ability to develop their land, so it also established a TDR program. *See* ECF No. 1 ¶ 12. The basic aim of a TDR program is to manage land use in a way that balances landowners' interests alongside the public interest. *See* David Berry & Gene Steiker, *An Economic Analysis of Transfer of Development Rights*, 17 Nat. Res. J. 55, 60 (1977). To that end, the program mandates that the County establish "sending" and "receiving" areas. A "sending area" (here, the Agricultural

Reserve) is one for which development is considerably limited, whereas a "receiving area" is one where development is encouraged. *See id.* Even the receiving areas, however, have "an upper limit on development density." *See id.* Any planned development that would exceed pre-set density limitations require the developer in advance to secure additional development rights from other landowners who hold like kind rights. So, for example, if a developer in a receiving area exceeds its limit for construction in a high-density, down-county area, it can purchase additional development rights, or "TDRs," from a sending area such as the Agricultural Reserve. *See* ECF No. 1 ¶¶ 12–13. The sale is accomplished when the Agricultural Reserve landowner "separates" her TDR from the real property and conveys title of the TDR to the buyer, thus foregoing her right to build one home per 25 acres. *See id.* ¶ 13.

As part of the Master Plan in 1980, the Damascus Property was granted 15 TDRs. ECF No. 1 ¶ 14. By the time the Property was sold to Michael J. and Barbara G. Cannizzo ("the Cannizzos") in 1983, only three TDRs remained attached to the Property. *Id.* ¶¶ 14–17. The Cannizzos, in turn, separated two of the three remaining TDRs through an easement granted to the County in 1986. *Id.* ¶ 18. Under the 1986 easement, "no additional single-family dwelling could be constructed on the Property." *Id.*

### B. Bachemheimer Trevan's Purchase and the County's Easement Offer

In 2004, Bachemheimer Trevan purchased the Damascus Property from the Cannizzos for $1.6 million, financing $1,280,000.00 with a loan from MidAtlantic secured by the Property. ECF No. 1 ¶ 19; *see* ECF No. 1-10. Fidelity underwrote the title insurance for the purchase, naming Bachemheimer Trevan as the insured on an associated "Owner's Policy." *See* ECF Nos. 1-1. Thereafter, Bachemheimer Trevan re-executed the deed to reflect a split ownership with her husband, Martin T. Trevan. ECF No. 1 ¶ 21. The Trevans later refinanced the Damascus

Property, and MidAtlantic was listed as the insured on the corresponding "Loan Policy." *See id.* ¶ 22; ECF No. 1-2.

The Loan Policy "insures MidAtlantic's first priority lien . . . on the property up to the insured amount of $1,282,780," and against "loss" caused by "[a]ny defect in or lien or encumbrance on the Title." *See* ECF No. 1 ¶ 50; ECF No. 1-2 at 7. Likewise, the Owner's Policy insures the Trevans' fee simple interest in the Damascus Property up to the insured amount of $1,600,000.00. *See* ECF No. 1-1. Each insurance policy also included a legal description of the Property that described three TDRs "relating to the parcel of land." *See id.*; *see also* ECF No. 1-2.

On June 7, 2012, the County offered to purchase two TDRs for building lot termination easements for $472,500.00. ECF No. 1 ¶ 24. The easements would have prohibited the construction of any additional homes on the Damascus Property. *Id.* In response, the Trevans applied to the County for permission to sell two of their three TDRs. *Id.* ¶ 25. The County replied that the Damascus Property only had one—not three—TDRs attached, and as a result, rescinded its offer. *Id.* ¶ 26.

The Trevans, in turn, submitted a claim to Fidelity under the Owner's Policy, seeking coverage arising from the erroneous titling of two TDRs at the time of purchase. ECF No. 1 ¶ 27. Fidelity accepted coverage under the Owner's Policy and filed suit in Montgomery County Circuit Court on the Trevans' behalf. *Id.* ¶ 28. On January 24, 2017, the Circuit Court granted summary judgment in the County's favor, concluding that two TDRs had not been attached to the Property at the time of purchase. *Id.* ¶ 29. Fidelity thereafter acknowledged that erroneous property description which included the two TDRs "constitutes a defect or encumbrance" on the title that is covered by the Owner's Policy and Loan Policy. *Id.* ¶ 31.

Fidelity next engaged the Treffer Appraisal Group to assess the value of the Damascus Property without the two attached TDRs as of February 1, 2013. *See* ECF No 1-13. The appraisal calculated the fair market value of the Damascus Property, including only one attached TDR, at $1,405,000.00. *Id.* at 4; *see also* ECF No. 1 ¶ 51. The appraisal also estimated the value of the two TDRs at $120,000.00. ECF No. 1-13 at 4. Fidelity, in turn, communicated the appraisal to the Trevans and offered to pay $120,000.00 directly to MidAtlantic as a principal reduction on its secured loan. ECF No. 1 ¶ 34. The Trevans rejected Fidelity's offer, contending that the loss is significantly greater. *Id.* ¶ 35.

As to MidAtlantic, Fidelity took the position that because the appraised value of the Property as of 2013 exceeds the loan amount, MidAtlantic was not reasonably likely to suffer any loss arising from the titling error. *See* ECF No. 1 ¶¶ 50 & 51. MidAtlantic, in turn, wrote to Fidelity on January 24, 2018, seeking clarification as to whether the TDRs were in fact detached from the property; whether the Canizzos had transferred the detached TDRs to the Trevans in 2017; and how Fidelity planned to satisfy any claim under the Owner's Policy or Loan Policy. *Id.* ¶ 36; *see also* ECF No. 23-1. Fidelity apparently never responded to this letter. Instead, nearly two years later, Fidelity requested that MidAtlantic "provide evidence of any loss or damage it has sustained or incurred." ECF No. 1 ¶ 37. When MidAtlantic did not respond, Fidelity filed this suit. *See id.* ¶¶ 38–39.

### C.   This Lawsuit

On May 26, 2021, Fidelity sought declaratory relief to determine the scope of coverage under the title insurance policies. ECF No. 1. As to MidAtlantic, Fidelity asks this to Court declare that it has not suffered, and is not likely to suffer, any loss or damage arising from the TDR titling error triggering coverage under the Loan Policy (Count II). As to the Trevans,

5

Fidelity asks the Court to declare that the maximum covered loss under the Owner's Policy is $120,000.00 (Count I).  *See* ECF No. 1 ¶¶ 42, 48–50.

The Trevans have answered the Complaint and filed counterclaims (ECF No. 24), so the matter will proceed as to them.  MidAtlantic has moved to dismiss the claims against it (ECF No. 18), arguing that Fidelity's asserted need for declaration as to the scope of coverage under the Loan Policy is too remote and speculative to confer standing, or alternatively that the claim is not ripe for review under the Declaratory Judgment Act.  *See* ECF Nos. 18, 23.  For the following reasons, the Court agrees with MidAtlantic and grants the motion.

## II.    STANDARD OF REVIEW

A challenge to this Court's subject matter jurisdiction requires the Court to determine whether it has the power to hear the case at all.  *Criscione v. U.S. Nuclear Regul. Comm'n*, 493 F. Supp. 3d 423, 428 (D. Md. 2020); *see also* Fed. R. Civ. P. 12(b)(1).  Fidelity, as the plaintiff, bears the burden of proving the existence of subject matter jurisdiction.  *See Evans v. B.F. Perkins, Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  At the motion to dismiss stage, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Evans*, 166 F.3d at 647.  A court should dismiss an action for lack of jurisdiction "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Evans*, 166 F.3d at 647.  But where the pertinent facts are in dispute or intertwined with the merits, the jurisdictional question may be ill-suited for resolution until further factual development.  *See United States v. North Carolina*, 180 F.3d 574, 580–81 (4th Cir. 1999); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

The Court alternatively treats the motion as one brought pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for declaratory relief. If the material facts, viewed most favorably to the non-moving party, do not state a claim upon which relief can be granted, the Court may dismiss the action pursuant to Rule 12(b)(6). *See Brownback v. King*, 141 S. Ct. 740, 749–50 (2021). To survive dismissal, the plaintiff's allegations "must be enough to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must be plausible, as opposed to merely possible, that the defendant is liable to the plaintiff in the manner alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.   ANALYSIS

MidAtlantic argues that Fidelity lacks standing to seek injunctive relief because no "substantial controversy" exists or is likely to arise in the foreseeable future. *See* ECF No. 18 at 7. The Declaratory Judgement Act provides that where a "case of actual controversy within its jurisdiction" exists, "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).[3] "The term 'case of actual controversy in the Act refers to the type of Cases and Controversies that are justiciable under Article III.'" *Mid-Continent Cas. Co. v. G.R. Constr. Management, Inc.*, 278 F. Supp. 3d 1302, 1305 (M.D. Fla. 2017) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)). Accordingly, the jurisdictional challenge brought under Rule 12(b)(1) and the merits inquiry under Rule 12(b)(6) and the Declaratory Judgment Act are largely the same—the plaintiff must plausibly aver that the alleged controversy is "of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Volvo Const. Equip. N. America, Inc. v. CLM*

---

[3] The Court treats the Complaint as invoking the federal Declaratory Judgment Act, 28 U.S.C. § 2201. *Cf. Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 261 n.3 (4th Cir. 2013); *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 468 (D. Md. 2015).

*Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004). At bottom, the Declaratory Judgment Act requires the plaintiff to demonstrate that a sufficiently concrete dispute exists between the parties. *See e.g.*, *Jones v. Sears Roebuck & Co.*, 301 Fed. App'x 276, 282 (4th Cir. 2008) (per curiam) (unpublished opinion); *Columbian Fin. Corp. v. BancInsure, Inc.*, 650 F.3d 1372, 1385 (10th Cir. 2011); *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163, 1170 (3d Cir. 1987). Otherwise, the Court's resolution would be no different than an impermissible "advisory opinion." *See United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947) ("As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.").

Here, Fidelity asserts that MidAtlantic's January 2018 letter constitutes a "claim" made against the Loan Policy giving rise to a substantial ongoing controversy between the parties. *See* ECF No. 23 at 8. And because MidAtlantic never gave Fidelity an approximation of "losses," when Fidelity asked for them nearly two years later, the purported "claim" is "still pending" and in need of resolution by declaration. *See id.* But even read most favorably to Fidelity, the January 2018 letter simply does not constitute a claim for coverage such that a substantial, ongoing controversy exists between the parties today. For one, the letter is four years old, and although it is styled as an insurance "claim," nowhere does it set out how or if the titling error resulted in MidAtlantic having sustained a loss covered under the Loan Policy. While a claim made for insurance coverage may be sufficiently concrete and imminent to confer standing, Fidelity has generated no facts to make plausible that MidAtlantic has filed any such "claim." *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Hicks, Muse, Tate & Furst, Inc.*, No. 1334 (SAS), 2002 WL 1482625, at *4 (S.D.N.Y. July 10, 2002) ("At the very least, there must be a claim against the insured to give rise to an anticipatory lawsuit by a liability insurance

carrier."). And the mere passage of time without any additional request from MidAtlantic for coverage under the Loan Policy renders speculative at best that a "substantial and ongoing" controversy exists between the parties based solely on the January 2018 letter.

As to losses that MidAtlantic may incur in the future from the titling error, Fidelity's main theory centers on demonstrating that MidAtlantic will never have any. *See* ECF No. 23 at 11. Fidelity points solely to the appraisal as to the Property's value in 2013 and asks this Court to infer that this appraisal alone demonstrates MidAtlantic has no covered loss under the Loan Policy. This is speculative at best. A 2013 valuation cannot predict the future damages or losses that MidAtlantic may face because of the title defect. It is undisputed that MidAtlantic still holds the loan secured by the Damascus Property and its attendant titling error. Contrary to Fidelity's insistence (ECF No. 23 at 11–12), no court can reasonably forecast when or if MidAtlantic may ever need to foreclose on the Property to satisfy the loan; nor can it divine if any future sale would be hampered by the historic titling defect. Stated otherwise, no facts make plausible that Fidelity can cabin all possible future events that may trigger coverage under the Loan Policy and also limit the scope of recovery based on a single historic appraisal. "[F]ederal courts are not in the business of opining on such hypothetical scenarios that may never come to pass." *See Allstate Ins. Co. v. Preston*, No. JKB-19-0429, 2019 WL 3067918, at *4 (D. Md. July 12, 2019). MidAtlantic's motion, therefore, must be granted.

## IV.    CONCLUSION

In sum, no facts make plausible that MidAtlantic and Fidelity have any "substantial continuing controversy," now or in the future, that is sufficiently concrete, particularized, and imminent to confer standing under the Declaratory Judgment Act. *See Mid-Continent Cas. Co.*, 278 F. Supp. at 1305 (quoting *Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985)).

9

Because it "is beyond the competence" of this Court to render an advisory opinion, *see United Pub. Workers*, 330 U.S. at 89, this action must be dismissed for want of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Likewise, and for the same reasons, the Complaint fails to state a claim against MidAtlantic, as is required by Federal Rule of Civil Procedure 12(b)(6).  Thus, the motion to dismiss is GRANTED.

      A separate Order follows.

February 8, 2022                                                           /s/
Date                                                                Paula Xinis
                                                                     United States District Judge